# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-01361-COA

TRANSNATIONAL VENTURES, INC. AND
TRANSNATIONAL ASSOCIATES, INC.

APPELLANTS

v.

DERR PLANTATION, INC.

APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 08/26/2014 |
| TRIAL JUDGE: | HON. M. JAMES CHANEY JR. |
| COURT FROM WHICH APPEALED: | ISSAQUENA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | DAVID M. SESSUMS |
| ATTORNEYS FOR APPELLEE: | KENNETH B. RECTOR |
| | ROBERT R. BAILESS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| TRIAL COURT DISPOSITION: | DIRECTED VERDICT IN FAVOR OF APPELLEE |
| DISPOSITION: | AFFIRMED - 02/23/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., ISHEE, AND WILSON, JJ.**

**WILSON, J., FOR THE COURT:**

¶1.     Transnational Ventures, Inc. and Transnational Associates, Inc. (collectively, "Transnational") claim that they are entitled to a $500,000 commission on a real estate deal that was never consummated. The property at issue is the "Derr Plantation" in Issaquena County, which consists of over 8,000 acres owned by Derr Plantation, Inc. ("DPI"). DPI is owned by the Derr family of Germany. The failed real estate deal, which fell apart in 2005, has been the subject of more than a decade of litigation between the would-be buyers, DPI, and the Derrs. That litigation has spanned state, federal, and German courts and continues

to this day.[1]

¶2.     But this case involves only Transnational's claim that it is entitled to a commission on the failed deal.  The case eventually proceeded to trial in August 2014, and after Transnational rested, the Issaquena County Circuit Court judge granted DPI's motion for a directed verdict on three grounds: (1) the alleged commission agreement was insufficiently specific as to the terms of an acceptable sale to require a commission in the absence of a sale; (2) Transnational was barred from recovering a commission because it acted as a real estate broker in this State without a license, *see* Miss. Code Ann. § 73-35-33(1) (Rev. 2012); and

---

[1] On March 1, 2005, the would-be buyers, Thomas L. Swarek and Thomas A. Swarek, sued DPI in chancery court seeking specific performance and/or damages for breach of an alleged contract to sell the plantation.  *Derr Plantation, Inc. v. Swarek*, 14 So. 3d 711,714 (¶¶3-4) (Miss. 2009).  In 2006, the chancery court denied cross-motions for summary judgment, and the Mississippi Supreme Court denied the Swareks' petition for an interlocutory appeal.  *Id.* at 715 (¶5).  The Swareks then moved to transfer the case to circuit court on the ground that "due to the passage of time, they preferred . . . damages" to specific performance.  *Id.* at (¶6).  The chancery court granted the Swareks' motion, *id.* at (¶7), but the Supreme Court reversed on interlocutory appeal, concluding that "[t]he primary thrust of the Swareks' complaint was a request for . . . specific performance of a real estate contract," a matter "within the historic equity jurisdiction of the chancery court."  *Id.* at 720 (¶20).  The case eventually proceeded to trial in the chancery court, and in May 2015, the court entered final judgment in favor of DPI.  The case is now, once again, before the Supreme Court on appeal and on a petition for a writ of mandamus.  *Swarek v. Derr Plantation, Inc.*, Nos. 2015-TS-00871 & 2015-M-01928.

The Swareks also sought to name members of the Derr family as defendants.  In response, the Derrs filed suit against the Swareks in German court and sought a declaratory judgment of non-liability.  The Swareks later discontinued their efforts to sue individual family members in the Mississippi case, but a German appellate court still ruled in favor of the Derrs and awarded them almost $300,000 in court costs as prevailing parties.  *See Derr v. Swarek*, 766 F.3d 430, 434-35 (5th Cir. 2014).  The Derrs attempted to enforce the German judgment against the Swareks in federal district court, but the district court refused to grant comity to the judgment.  *See id.* at 435-36.  The Derrs appealed the district court's ruling, but a divided panel of the Fifth Circuit affirmed.  *See id.* at 444.

2

(3) the evidence established that Transnational was not the procuring or predominant cause of the offer to buy the property. We agree with the circuit judge that DPI was entitled to judgment as a matter of law and therefore affirm.

## FACTS AND PROCEDURAL HISTORY

¶3. Paul Pillat is the president of Transnational Ventures, Inc. and its wholly owned subsidiary, Transnational Associates, Inc., both Georgia corporations. Transnational Associates and Pillat are licensed as real estate brokers in Georgia but not in Mississippi. Pillat testified that when he has sold real estate in Mississippi in the past, he has "always worked through" G.A. Robinson Land Company, a Mississippi-licensed broker.

¶4. Pillat is also a licensed CPA in Georgia, and in the early 1980s he began preparing tax returns for DPI. Herman Derr, who lives in Germany, was DPI's president at all relevant times. Pillat later performed additional services for DPI and even served for a time as one of its directors.[2] From 1993 to 2002, Pillat had very little contact with DPI.

¶5. In 2002, Pillat received an offer to purchase the farm, which he forwarded to Derr. Derr responded by letter that he would be willing to sell the farm for $10.5 million, less a $500,000 commission to Pillat, but the farm was not sold at that time. In 2004, DPI contacted Pillat and asked him to do some consulting work related to the farm. Pillat met with DPI representatives at the farm and in Vicksburg, and he billed DPI and was compensated for his time and expenses.

---

[2] During this time, Derr also loaned Pillat $100,000, and Pillat admitted that Derr may have forgiven $20,000 or more of that debt. Pillat testified at trial that Derr was a kind, generous, and honorable man.

3

¶6.     Pillat testified that sometime in 2004, Derr asked him to help sell the farm. Pillat testified that initially "some commission rates floated around" but eventually he told Derr that his "minimum commission" was "five percent" and that Derr responded that "that should be no problem."

¶7.     Pillat testified that sometime between April and June 2004, he told Earl Eckerson that the farm was for sale. Pillat explained that Eckerson is a "finder," meaning that he "drives around the Mississippi Delta and looks for farm properties" for others. In August 2004, Eckerson faxed Pillat an informal handwritten proposal to buy the farm. The proposed buyer was a client of Eckerson's, W.L. Pointer. Eckerson asked Pillat to meet with him and Pointer. Pillat testified that he did not travel to Mississippi specifically to meet with Pointer and Eckerson, but he agreed to have dinner with them in Vicksburg only because he was already scheduled to be at the farm on other business. At dinner, Pointer offered to buy the farm, essentially on the terms set out in his proposal.

¶8.     After meeting with Pointer and Eckerson, Pillat notified Derr of Pointer's offer by letter that stated in part:

> On the potential sale of your property, I met with a Bank President from the Kansas City area [(Pointer)] along with his investment colleague from Jackson, Mississippi [(Eckerson)] during the evening of August 19. They made a verbal offer of $6 million for everything which I told them was too low. I asked them to sharpen their pencils and then come back with a higher offer. They are presently doing some additional research regarding the farm and I expect to have a more formal offer from them in the next two weeks.

Eckerson followed up with a fax to Pillat in which he conveyed an offer from Pointer to buy the farm for $6.5 million or, alternatively, lease the property, but no deal was reached.

4

¶9. Although Pointer did not buy the farm, Pillat contends that his contacts with Eckerson ultimately resulted in another offer to buy the farm. Eckerson told Trey Heigle that Pillat said the farm was for sale. Heigle then told Thomas L. Swarek about the farm, and Heigle and Swarek discussed buying it as partners.[3] They also met and rode around the farm with representatives from Metropolitan Life Insurance Company to discuss financing.

¶10. On December 2, 2004, Swarek faxed DPI an offer to purchase the farm and in response received a phone call from Joachim Witt, a DPI executive in Germany. According to Swarek, Witt assured him that no realtor was involved, and Derr and Witt sent Swarek a letter that stated in part: "We are in conformity that neither you nor we are obligated to pay any broker commission in case of an eventual sale and purchase of the farm."

¶11. Pillat testified that he first heard of Swarek during a December 8, 2004 meeting at DPI's offices in Germany. Pillat testified that at this meeting, Derr said to him, "I'd like you to sell the farm for me, and net of proceeds to us of six and a half million dollars and anything above that that you're able to realize, you can keep." Pillat's discussions with Derr were always in German, Derr's native language, which Pillat speaks with at least some level of proficiency. After the meeting, Witt gave Pillat a copy of Swarek's offer. Pillat testified that Witt stated, in German, that Swarek was Pillat's "deal now" and that Pillat should "follow up" with him. Witt also gave Pillat a copy of the letter from DPI to Swarek, which stated that neither side would be required to pay any commission to a broker.

¶12. After Pillat returned to the United States, he made contact with Swarek and provided

_____

[3] Swarek testified that he learned that the farm was for sale from someone other than Heigle.

5

him with additional information about the farm. Pillat testified that after further discussions, Swarek decided to make a written offer, so Pillat obtained a Mississippi form contract from G.A. Robinson Land Company and gave it to Swarek. Swarek filled in the contract with a purchase price of $7 million, and around January 1, 2005, he sent the offer to DPI. DPI emphasizes that Swarek's offer was subject to contingencies, including that it granted Swarek a ten-day option to terminate the contract in his "sole and absolute discretion, . . . for any . . . reason, or for no reason." After Swarek submitted this offer, he communicated directly with DPI.

¶13.    On January 9, 2005, Pillat faxed Derr a letter in which he asserted: "On Wednesday, December 8th, [2004,] . . . you specifically told me that you would sell the farm as long as net proceeds to you were US$ 6.5 million and that I would receive any proceeds above that as compensation." The next day, Derr responded that on December 8, he had told Pillat only: "[I]f you brought DPI . . . a buyer, I might be willing to sell for at least a net price of [$]6.5 million . . . (remaining for DPI), plus your commission out of the gross sales proceeds." Derr also denied that Pillat was entitled to any commission for a sale to Swarek, since Pillat did not refer Swarek to DPI. Rather, in Derr's view, Swarek approached DPI directly and had offered $7 million to purchase the farm before Pillat ever spoke to him.

¶14.    Pillat never responded to Derr's letter in writing or confronted Derr or anyone else at DPI regarding the commission. Instead, he told Swarek that DPI had taken the position that it did not owe him a commission for any sale to Swarek, and he asked Swarek to write a new offer to purchase the farm under a different name. Swarek agreed and wrote an offer from

6

Caspen Operating Company, a company owned by his daughter, which Pillat then submitted to DPI. Either Swarek or his daughter signed her boyfriend's name to the offer and the earnest money check in order to disguise that the offer was from Swarek.

¶15. For reasons that are not critical to our decision in this appeal, but which may prove important in another (*see supra* note 1), Swarek and DPI never consummated a sale of the farm. Suffice it to say, Transnational contends that Swarek was a ready, willing, and able buyer, while DPI contends that he was not. In any event, discussions between Swarek and DPI broke down in February 2005, and on March 1, 2005, Swarek filed a complaint against DPI in the Issaquena County Chancery Court.

¶16. In February 2006, Derr passed away at the age of ninety-five.

¶17. In June 2006, Transnational filed a complaint in the circuit court, alleging that it was entitled to a commission of $500,000, as well as other compensatory damages, pre- and post-judgment interest, punitive damages, and attorneys' fees. It appears that Transnational agreed informally to stay the litigation pending resolution of Swarek's lawsuit against DPI in chancery court. Thus, there was little action in this case until 2013, when Transnational hired a new attorney, who "advised that any such understanding is now withdrawn." DPI then moved to stay proceedings pending resolution of the chancery court lawsuit. However, the circuit judge denied DPI's motion, and the case proceeded to trial in August 2014.

¶18. At trial, Transnational called Eckerson, Heigle, Swarek, and Pillat as witnesses. After Transnational rested, the circuit judge granted DPI's motion for a directed verdict for the three distinct, alternative reasons noted in the introduction to this opinion. Transnational

filed a timely notice of appeal and argues that DPI was not entitled to a directed verdict on any of those grounds.

## ANALYSIS

¶19.     "On appeal, the standard of review utilized by this Court on motions for a directed verdict is de novo, and we view the evidence in the same light as the circuit court." *Cent. Indus., Inc. v. McFarlane*, 159 So. 3d 610, 613 (¶6) (Miss. Ct. App. 2015).  A motion for a directed verdict under "Rule 50(a) [of the Mississippi Rules of Civil Procedure] enables the court to determine whether there is any question of fact to be submitted to the jury and whether any verdict other than the one directed would be erroneous as a matter of law . . . ." M.R.C.P. 50 advisory committee's note adopted July 1, 2014.  A directed verdict is appropriate if the plaintiff fails to present credible evidence in support of all necessary elements of its claim.  *McFarlane*, 159 So. 3d at 613 (¶6).  "The court must consider all evidence then before it in the light most favorable to the plaintiff and must concede to the plaintiff all favorable inferences that could reasonably be said to arise from that evidence." *Id.* (quoting *Alfa Mut. Ins. v. Cascio*, 909 So. 2d 174, 178 (¶11) (Miss. Ct. App. 2005)).  The court should direct a verdict for the defendant if, even giving the plaintiff the benefit of all favorable inferences, "no reasonable juror could find for the plaintiff." *Id.* (quoting *Alfa Mut. Ins.*, 909 So. 2d at 178 (¶11)).

¶20.     For the reasons explained below, we conclude that the circuit judge properly granted DPI's motion for a directed verdict for two reasons: first, the terms of the alleged oral commission agreement do not support a commission in the absence of a sale; and, second,

Transnational is barred from recovering a commission because it acted as a real estate broker in this State without a license.[4]

## I. The Alleged Oral Commission Agreement Does Not Support a Commission in the Absence of a Sale.

¶21. The parties agree that *Hamilton v. Hopkins*, 834 So. 2d 695 (Miss. 2003), sets out the general rules applicable to a broker's claim for a commission on a real estate transaction. In *Hamilton*, the Supreme Court stated that

> [t]he general rule of brokerage contracts is that when a principal and a broker enter into a contract and the contract "specifies the price and terms of sale, the agent performs his duty, and is entitled to a commission, when he procures a purchaser ready, willing and able to buy, even though the owner may then decline to sell."

*Id.* at 701 (¶20) (quoting *Varner Real Estate, Inc. v. Bobb*, 491 So. 2d 528, 529 (Miss. 1986)). However, the Supreme Court went on to explain that the "'ready, willing, and able' rule" was inapplicable when the parties agreed that the broker's commission would be due "at the time of closing" and would be paid "from the proceeds of the transaction." *Id.* at 702 (¶22). The Supreme Court held that a broker is "bound to the specific terms of the contract" and that an agreement that the commission will be paid from the proceeds of the transaction will be enforced. *Id.* Accordingly, the Supreme Court held that a broker who agreed to be paid from the proceeds of a transaction was not entitled to a commission if the transaction

---

[4] Because we conclude that DPI was entitled to a directed verdict on either of these two grounds, we need not decide whether Transnational presented credible evidence that it was a procuring and predominant cause of Swarek's offer to buy the farm. We also need not address Transnational's argument that the trial judge erred by excluding two documents that, in its view, are evidence "that Swarek was a ready, willing, and able purchaser." Whether Swarek was ready, willing, and able is not relevant to either of the grounds on which we affirm the directed verdict in favor of DPI.

was not consummated, regardless of whether he presented his principal with a "ready, willing, and able" counter-party. *Id.*

¶22.     Although Transnational seeks to recover under an oral agreement rather than a written contract, *Hamilton*'s holding clearly applies to the alleged agreement, as Pillat himself describes it. Pillat testified that on December 8, 2004, Derr told him, "I'd like you to sell the farm for me, and net proceeds to us of six and a half million and anything above that that you're able to realize, you can keep." Pillat later testified, "[Derr] said sell the property and any proceeds net above six and a half million you can keep as your commission or fee." According to Pillat, "the agreement was if the property sold for a net of proceeds of six and a half million, that anything above that I would keep."

¶23.     Pillat's testimony regarding the source and timing of his commission is consistent with the parties' correspondence. In a June 3, 2004 letter to Pillat, Derr confirmed that a "success fee" would be paid "in the event of the sale to a solvent, serious buyer after the contract has been closed." In an October 5, 2004 letter to Pillat, Derr stated, "[DPI] pays a commission exclusively in case of evidence of success, i.e. after sale and complete purchase price payment." In a December 23, 2004 letter to Derr, Pillat stated,

> I would like to with this letter confirm how I am to be compensated . . . .
>
> Upon the successful sale of the farm real property, I shall receive a fee equivalent to five percent (5%) of the gross sales price. During our recent meeting . . . you stated that I could earn anything above a sales price of $6,500,000. . . .

Finally, in a January 9, 2005 letter to Derr, Pillat asserted: "During [our] meeting . . . you specifically told me that you would sell the farm as long as net proceeds to you were US$ 6.5

10

million and that I would receive any proceeds above that as compensation."

¶24.    Thus, Pillat himself consistently stated that he would be paid a commission from the "proceeds" of an actual sale.  He even confirmed, in writing, that he was entitled to compensation "[u]pon the successful sale of the farm."  Because there was no sale, there were no "proceeds," so Pillat is not entitled to a commission regardless of whether Swarek was ready, willing, and able to buy.  As the Supreme Court put it in *Hamilton*, "If [Pillat] wanted [his] commission contingent on procuring a [buyer] ready, willing and able to consummate the transaction, [he] very easily could have contracted for as much.  Such not being the case, [he] is not entitled to a commission . . . ." *Hamilton*, 834 So. 2d at 702 (¶22).

¶25.    Moreover, we also agree with the circuit judge that, even as described by Pillat, the terms of the alleged oral agreement were not sufficiently specific to entitle Transnational to a commission in the absence of a sale.  Mississippi law on this issue is as follows:

> Where the contract between the owner of the property and the agent specifies the price *and terms* of sale, the agent . . . is entitled to his commission[] when he procures a purchaser ready, willing and able to buy, even though the owner may then decline to sell.
>
> . . . .
>
> [But w]here the price *and terms* are not specified in the contract between the owner and the agent, and the actual sale is made by the owner, . . . the agent . . . is entitled to his commission[] when he procures a purchaser to whom the principal sells.

*Partee v. Pepple*, 197 Miss. 486, 501, 20 So. 2d 73, 78 (1944) (emphasis added).

¶26.    In this case, Pillat admitted that DPI specified none of the necessary terms of the sale other than price.  Pillat also volunteered, on direct examination, that "price is only one part

11

of the purchase of a property. There are always the terms and conditions . . . . [P]rice is just one aspect of a contract." Finally, he admitted that he "knew there would be a process of negotiation" between Swarek and DPI, but "as long as we could negotiate through all those other issues and [DPI] could net out six and a half million at the end of the day, that was the deal." Transnational argues on appeal that this was a "very simple" land sale and so nothing other than price needed to be specified in his alleged brokerage agreement, but the proposed transaction involved not only 8,000-plus acres but also homes, cattle, and farm equipment, among other assets.

¶27.    Put simply, Pillat admitted that his alleged oral agreement with DPI specified no terms other than price and that all remaining terms and the actual sale had to be negotiated by DPI and Swarek. Under longstanding precedent, this means that he was entitled to a commission, if at all, only upon a successful sale of the farm. *Partee*, 197 Miss. at 501, 20 So. 2d at 78.

## II.    Transnational Is Barred from Recovering a Commission Because it Acted as a Broker in This State Without a License.

¶28.    As an alternative basis for affirming, we also agree with the circuit judge that Transnational is barred from recovering a commission pursuant to the Real Estate Brokers License Law, Mississippi Code Annotated sections 73-35-1 to -35 (Rev. 2012 & Supp. 2015). That law provides that no person may act as a real estate broker in Mississippi without first obtaining a license. Miss. Code Ann. § 73-35-1. The law further provides that

> [n]o person . . . or corporation shall bring or maintain an action in any court of this state for the recovery of a commission, fee or compensation for any act done or services rendered, the doing or rendering of which is prohibited under the provisions of this chapter for persons other than licensed real estate brokers, unless such person was duly licensed hereunder as a real estate broker

12

at the time of the doing of such act or the rendering of such service.

Miss. Code Ann. § 73-35-33(1); *see also Lutz Homes, Inc. v. Weston*, 19 So. 3d 60, 64 (¶15) (Miss. 2009) ("to maintain an action . . . , a real estate broker must have been licensed at the time of the act or service"). The definition of "real estate broker" under Mississippi law broadly includes

> all persons . . . [or] corporations, . . . who for a fee, commission or other valuable consideration, or who with the intention or expectation of receiving or collecting the same, list, sell, purchase, exchange, rent, lease, manage or auction any real estate, or the improvements thereon, including options; or who negotiate or attempt to negotiate any such activity; . . . or who direct or assist in the procuring of a purchaser or prospect calculated or intended to result in a real estate transaction.

Miss. Code Ann. § 73-35-3(1) (Rev. 2012). Moreover, the statute makes clear that "the performance of any [one] act or activity" within this broad definition brings a person or corporation within the law's license requirement. Miss. Code Ann. § 73-35-3(3). Thus, these statutes apply even if most of the broker's activities are conducted in another state; it is "only necessary . . . [to] show that [the broker], in this state, negotiated or attempted to negotiate such sale, or directed or assisted in procuring a purchaser or prospect calculated or intended to result in such real estate transaction." *Ladner v. Harsh*, 239 Miss. 46, 52, 120 So. 2d 562, 565 (1960).

¶29. We agree with the circuit judge that under the plain language of these statutes, Transnational is barred from recovering a commission.[5] Pillat testified that by the time of

_____

[5] Transnational devotes much of its argument on this issue to a discussion of out-of-state cases addressing whether a broker may recover a commission in a state in which the broker is not licensed. Some of these cases are factually distinguishable, while others were decided under statutory provisions that differ materially from ours. Obviously, none are

his dinner in Vicksburg with Eckerson and Pointer, he had been engaged by DPI to find a buyer for the farm with the expectation of receiving a commission if he succeeded. On behalf of Pointer, and in advance of the dinner meeting, Eckerson sent Pillat a proposal to buy the farm. At the dinner meeting, the parties discussed the farm and a potential purchase price, and Pillat told them, in his own words, that their offer was "too low" and that they needed "to sharpen their pencils and then come back with a higher offer." Eckerson followed up with Pillat after the meeting with another informal offer. Although Transnational attempts to minimize the significance of the meeting[6] and characterizes Pointer's dinner-table offer as "unsolicited," Pillat knew in advance that the purpose of the meeting was to discuss a potential sale of the farm, having already received Pointer's proposal to buy it. Moreover, he testified that he had discussed the farm with Eckerson and told him that it was for sale precisely because Eckerson was a "finder" who could identify potential buyers.

¶30.    Given the circumstances of the dinner and Pillat's own testimony and report to Derr, it is clear that Pillat "negotiate[d] or attempt[ed] to negotiate" the sale or lease of real estate,

binding precedent. For the reasons explained in the text, we conclude that under the plain language of our statutes, Transnational is barred from recovering a commission in this case. *DeSoto Cty. v. T.D.*, 160 So. 3d 1154, 1157 (¶9) (Miss. 2015) ("[W]here our statutes are clear, we do not look to other states' interpretations of their own statutes.").

       [6] At the same time that it attempts to minimize the significance of the meeting in an effort to avoid the statutory bar to recovering a commission, Transnational also relies on Pillat's contacts with Eckerson as an essential link in its argument that it was a procuring cause of Swarek's offer. Specifically, as noted above, Transnational argues that after the meeting, Eckerson told Heigle that the farm was for sale, and Heigle told Swarek. Transnational cannot insist that Pillat's meeting with Eckerson and Pointer was so insignificant that it did not even constitute a brokerage activity and at the same time argue that it is entitled to a commission because Pillat's contacts with Eckerson are responsible for producing a ready, willing, and able buyer.

14

while in the State of Mississippi, without a license. Miss. Code Ann. § 73-35-3(1). At a minimum, he "assist[ed] in the procuring of a purchaser or prospect calculated or intended to result in a real estate transaction," while in this State, without a license. *Id.* That his other efforts to sell the farm were conducted from Georgia or elsewhere is of no moment. *See* Miss. Code Ann. § 73-35-3(3); *Ladner*, 239 Miss. at 52, 120 So. 2d at 565. Because Transnational, through Pillat, acted as a broker in this State without first being "duly licensed, [it] could not 'maintain an action in any court of this state for the recovery of a commission, fee or compensation.'" *Mosley v. Triangle Townhouses, LLC*, 170 So. 3d 1251, 1253 (¶13) (Miss. Ct. App. 2015) (quoting Miss. Code Ann. § 73-35-33(1)). Therefore, the circuit judge properly granted DPI's motion for a directed verdict on this basis. *See id.*

**CONCLUSION**

¶31. Even accepting as true Transnational's description of its alleged oral commission agreement with DPI, the agreement would not entitle Transnational to a commission in the absence of a sale. There was no sale, so there were no "proceeds," and there can be no commission. In addition, Transnational is barred from maintaining an action to recover a commission because it acted as a broker in this state without first being licensed. For these reasons, we affirm the circuit court's judgment granting a directed verdict in favor of DPI.

¶32. **THE JUDGMENT OF THE CIRCUIT COURT OF ISSAQUENA COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON AND FAIR, JJ., CONCUR. JAMES AND GREENLEE, JJ., NOT PARTICIPATING.**

15